# UNITED STATES DISTRICT COURT
## Southern District of Ohio

Plaintiff                                         Case No. 3:22-cv-327

Peter Thompson
                                                  Judge Michael J. Newman
                                                  Magistrate Judge Caroline H. Gentry

Vs.


Defendant(s)

Mayor Jeffery J. Mimms, Jr

And Mike Powell Director at the

Department of Water Division

Of Water Utility



Here comes before this court Peter Thompson, a pro se plaintiff in filing a complaint against the

Mayor of Dayton Jeffery J. Mimms, Jr, who oversees operations and management of the

Department of Water Division of Water Utility. Mike Powell Director at the Department of

Water Division of Water Utility.


**<u>Jurisdiction</u>**

The plaintiff in this case Peter Thompson the primary listed owner on the mortgage of the home

found at 24 Edgar Ave, Dayton, Ohio 45410 files this case under 28 U.S.C. 1331, a case under

the United States Constitution. The defendant(s) have violated federal law that is governed under

The Americans Disability Act, by treating the plaintiff differently than others with or without

disabilities. Tittle III of the ADA provides that "no individual shall be discriminated against on

the basis of disability in the full and equal enjoyment of the services, privileges, advantages, or

accommodations of any place of public accommodation" (42 U.S.C. 12182(a).

1

The plaintiff in this case Peter Thompson files this case under 28 U.S.C. 1331, a case under the United States Constitution. The defendant(s) have violated the plaintiff's Fifth Amendment right which forbids taking private property for public use without just compensation, and by doing so violated the plaintiff's 14th amendment rights under due process.

## Complaint I

1. On or about June 16, 2022, The Department of Water Division of Water, the utility field worker showed up at the plaintiff's home located at 24 Edgar Ave, Dayton, Ohio 45410 to execute a shut off order for a delinquent bill of $375.79.

2. The utility field worker executing the order was directed by the administration of the Department of Water. The utility field worker was informed by the plaintiff that he had not received a bill, nor was there any personal delivery notice ever posted. The utility field worker told me he was only there to perform his job and was turning off the water based on the work order sheet he was given to turn off the water at the described house.

3. The plaintiff rushed inside the home to fill up water containers to feed his family, especially his son who suffers from ADHD, and an intellectual disability as well as myself who is also disabled.

4. After one half an hour the utility worker was unable to shut off the plaintiff's water, and the utility worker then called his supervisor out to the location, who also realized the water at 24 Edgar Ave would not shut off.

5. Under Ohio rules the plaintiff is protected from unlawful disconnections of service without proper notice given to the homeowner and those restrictions are defined below;

6.  Under Ohio Rule 4901:1-15-27, Personal delivery of the notice to the customer's premises shall first be attempted. If personal service cannot be carried out then, the notice shall be securely attached to the premises conspicuously.

7.  The customer must be given not less than fourteen days' written notice before service is disconnected when any of the following conditions exist:

8.  Nonpayment of any tariffed charges when due or within any added period for payment permitted by the company, or for not making a deposit as required. Disconnection of service nonpayment may not occur before fourteen days after the due date.

9.  For violation of federal, state, or local laws or ordinances where such violation affects the provision of utility service by a waterworks company and/or sewage disposal system company, and the plaintiff was not given a 48-hour notice as considered necessary.

10. The municipality is legally obligated to give notice to the person responsible for the account. A minimum of 14 days (about 2 weeks) written notice of termination is required for water and electricity accounts in arrears and if the notice period is shorter than 14 days (about 2 weeks), or not supplied, the disconnection is illegal.

11. The City of Dayton Department of Water on November 8, 2021; followed procedure by leaving a yellow tag notice on the front doorknob of the residence as required but was for seven (7) days not the required period and treating the plaintiff different.

12. Unlike the second time treating the plaintiff differently, the water department was notified the first time of being disabled, and no tag or notice was given.

13. 2016 Ohio Revised Code, Title [49] XLIX PUBLIC UTILITIES, Chapter 4933 - COMPANIES - GAS; ELECTRIC; WATER; OTHERS, Section 4933.99 - Penalty.

    **Universal Citation:** Ohio Rev Code § 4933.99 (2016)

3

14. The plaintiff cites the Rules and Regulations of the Department of Water in Dayton, Ohio, section H Billing and Delinquent Accounts below;

(1) After reading the meter or estimating consumption, a statement of water and sewer charges due shall be sent to the customer on file with the Division of Revenue and Taxation. If the bill is not paid by the day specified for payment of the net amount (gross less 5% discount), second notices shall be mailed.

(2) Should a bill remain unpaid for 21 days after the net payment date, the account shall be considered delinquent and processed as follows: A 48-hour notice of shut off shall be delivered to the property where the water was consumed, and a duplicate copy thereof shall be mailed to the billing address. The water service shall be shut off as soon after 48 hours as practicable and not turned on again until all bills and further charges are paid, except as otherwise provided herein.

## Complaint II

15. The purpose for filing this action in federal court is the fear of not being fair or impartial with a state court setting disputing water right, Water rights are regulated state by state and each municipality can enforce stricter provisions on water access and usage. Both the state of Ohio and the municipality have shared or equal economic interests about water services.

16. The plaintiff who is the primary signer of the mortgage loan experienced an unjustifiable act in which his water was turned off at the residence described as 24 Edgar Ave, Dayton Ohio 45410 for non-payment of utility services, by The Dayton Water Department regulated by the municipality of Dayton and overseen by the state regulator commission.

17. The actions of The Dayton Water Department were administered without notice, and their attempt to disconnect services was unsuccessful. Several attempts to communicate with the city of Dayton were ignored, citing that payment needed to be paid regardless.

18. The plaintiff's wife Rebecca Kelly had made two phone calls to The Dayton Water Department, one occasion the representative saying a removal of a well occurred years ago and that the plaintiff had nothing showing a well existed, on the second occasion the plaintiff's wife asked that the account be closed being the water department had turned off the water in hopes of stopping added cost.

19. The representative informed the plaintiff's wife that she was unable to close the account due to the meter in the plaintiff's basement on site, which seems to supersede the meter at the easement and suggested disconnecting the meter found in the basement of the home.

20. No attempts were made by the plaintiff to remove or tamper with any meter in the home and that any such disconnection would be considered unlawful, even though the meter in the home is an intrusive device serving no purpose by metering the absolute ownership of nonnavigational groundwater beneath the home.

21. The plaintiff as of October 15, 2022, has experienced reduced pressure or water flow within the home described as 24 Edgar Ave, Dayton, Ohio 45410.

22. Through the expansion of over 800 miles of water lines the state of Ohio, or the municipality took no consideration of disruption to the homeowner that receive help from nonnavigational ground water flowing freely underneath the property or land.

23. A representative at the water department has also said that a lien will be placed on the home (lien defined as a right to keep possession of property belonging to another person until a debit owed by that person is discharged. ("Shall be entitled to a lien on any lot sold") which the plaintiff claims to be a municipality take over.

24. Water is a "public good" and not ownable as private property. Landowners do have the right to make use of the nonnavigational groundwater flowing through their property including the right to withdraw it and otherwise control it to the extent that nature allows, so long as the rights of others are not infringed upon.

25. The Dayton Water Department has expressed their ownership of landownership by continuing to charge the plaintiff regardless of the fact water was turned off;

26. As of June 16, 2022, the water was turned off with a balance of $375.79 between January 8, 2022, and April 08, 2022.

27. As of April 09, 2022, until June 08, 2022, the new balance with the water turned off at the property owner's easement was $460.06.

28. As of April 09, 2022, until July 08, 2022, the balance with the water shut off at the owner's easement was $460.06, and unchanged from the earlier billing cycle.

29. As of October 01, 2022, until October 07, 2022, the balance with the water shut off at the owner's easement increased to $735.38. The plaintiff has been treated differently.

30. The plaintiff moved into 24 Edgar Ave, Dayton, Ohio 45410 on October 13, 2021, and was pressured into paying an invoice of $978.73 or be subject to disconnection.

31. The invoice number was 7366478, and the date of invoice was November 10, 2021. The cycle dates on the invoice were from July 10, 2021, until October 12, 2021, prior to the plaintiff taking control of the residence and paying for the prior resident, therefore the plaintiff being treated differently by covering the cost of someone else's use.

32. Eminent domain refers to the power of the government to take private property and convert it into public use. The Fifth Amendment provides that the government may only exercise this power if they provide just compensation to the property owners.

6

33. Riparian rights are a type of water rights awarded to landowners whose property is found along flowing bodies of water, such as rivers or streams.

34. In the event the water is a non-navigable waterway, the landowner generally owns the land beneath the water to the exact center of the waterway.

35. Riparian rights have been historically decided by the courts as a "natural flow" theory. This theory states that riparian owners must ensure that water would continue along its natural course of flow or existence.

36. Riparian owners can use the water if they do not interfere or prohibit other riparian owners' rights to maintain the water in its natural flow or existence. Most jurisdictions have moved away from the natural flow theory, now they favor the reasonable use theory, which says that a riparian owner is guaranteed reasonable use of the water.

**Just Compensation Requirement:**

37. In Kohl v. United States, 91 U.S. 367 (1875), the Supreme Court held that the government may seize property through the use of eminent domain, as long as it appropriates just compensation to the owner of the property.

38. In Loretto v. Teleprompter Manhattan CATV Corp. 458 US 419 (1982), the Supreme Court clarified that when the government engages in a taking and implements a permanent physical occupation of the property, it must provide the property owner with just compensation, even if the area is small and the government's use does not greatly affect the owner's economic interest.

39. The taking in the plaintiff's case stands for constructive taking (also called regulatory taking), which means that the government restricts the owner's rights so much that the governmental action becomes the functional equivalent of a physical seizure.

40. The <u>Fifth Amendment of the United States Constitution</u> mandates that if the government takes private property for public use, the government **must** provide "<u>just compensation.</u>"

41. Many types of government actions infringe on private property rights. The Fifth Amendment's compensation requirement is not limited to government seizures of real property. Instead, it extends to all kinds of tangible and intangible property, including but not limited to <u>easements</u>, <u>personal property</u>, <u>contract rights</u>, and <u>trade secrets</u>.

42. As early as 1861, Ohio recognized a right of ownership in the groundwater beneath one's property. But the law allowed any property owner to have absolute ownership over all the groundwater he or she could use and provided no legal remedy if that use interfered with another property owner's water rights.

43. The Supreme Court of Ohio has ruled that a landowner has a property interest in any groundwater underlying the land and that governmental interference with that right could be considered an unconstitutional taking of property. The fifth amendment. ... forbids taking private property for public use without just compensation or due process of law. That provision has always been understood as referring only to a direct appropriation, and not to consequential injuries resulting from the exercise of lawful power.

44. In United States Constitutional law, a regulatory taking occurs when governmental regulations limit the use of private property to such a degree that the landowner is effectively deprived of all economically reasonable use or value of their property.

45. Under the Fifth Amendment to the United States Constitution governments must pay just compensation for such takings. The amendment is incorporated into the states via the Due Process Clause of the Fourteenth Amendment.

46. Regulatory takings jurisprudence has its roots in Justice <u>Oliver Wendell Holmes</u>' Opinion in *<u>Pennsylvania Coal v. Mahon</u> (1922)* which said that: "The general rule, at least, is that,

8

if regulation goes too far, it will be recognized as a taking for which compensation must be paid."

47. In *United States v. Dickinson*, 331 U.S. 745 (1947), the Supreme Court held that even if the government does not physically seize private property, the action is still a taking "when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time."

48. The plaintiff Peter Thompson, who is the primary signer of the mortgage contract for 24 Edgar Ave, Dayton, Ohio 45410, believes that the City of Dayton is not acting for the good of the community, the plaintiff has only been subject to increase in billing, the water department has acted as a conglomerate under the cover of a city municipality.

49. The plaintiff's point is The Dayton Water Department has made water distribution industrialized, and not a public service. If you call 211 for aid with a water bill you will find limited sources, and more sources for utilities which are private and serving more as a public servant.

50. Service line Warranties of America is an independent company claiming a separation from the local utility company, with their corporate office found at 4000 Town Center Boulevard, suite 400, Canonburg, PA 15317, and claims to be a utility service partnership.

51. On June 17, 2022, the plaintiff Peter Thompson was sent a notice of warrantee for exterior water service by Service line Warranties of America and displayed in the upper right hand conner the document was the water department's government seal. Again, the plaintiff is treated differently by receiving unsolicited mail, that the plaintiff never subscribed to, and not aware how this insurance company knew of the plaintiff's dispute with the Dayton Water Department.

52. The insurance company was asking for a premium as low as $3.75 per month to protect the homeowner from costs that could reach repair bills on wells belonging to the homeowner and being the homeowner's responsibility for repairs. The estimated cost could reach $8,500.00 per service call.

53. The plaintiff finds information from the water department questionable, as representatives have told the plaintiff's wife that no well system exists on the plaintiff's property.

54. The plaintiff searched the Dayton City website as to why and insurance company would display the water department municipal seal and find out the policy for sending the plaintiff's contact information for the purpose of solicitation. The plaintiff reviewed the policies on Disclosure's to third parties, intellectual property, and copy rights.

DISCLOSURE TO THIRD PARTIES

55. The city will not rent, sell, or distribute any personally identifiable information entered the website (name, address, phone number, etc.) or electronic mail address to any third party for marketing or mailing list purposes. Your credit card information will not be disclosed for any reason except those related to your transaction or as required by law.

INTELLECTUAL PROPERTY

56. All content on the city's website, including text, graphics, logos, button icons and images, is the property of or licensed by the City of Dayton and is protected by United States and international copyright laws.

57. The selection, arrangement, and presentation of all materials on this website (including information in the public domain), and the overall design of this website is the exclusive property of the City of Dayton and is protected by United States and international copyright laws

58. All City of Dayton graphics, logos, page headers, button icons, scripts and service names are trade dress of City of Dayton. Such trade dress may not be used in connection with any product or service that disparages or discredits the City of Dayton, its products or services, this website or any third parties.

59. According to the Dayton Business Journal published January 15, 2021, by John Bush senior reporter Dayton received $73 Million dollars for water infrastructure improvements.

60. Based on information from the Dayton Water Department website, which also claims the water department brings in $45 million dollars in revenue per year. On mcohio.org current information shows the water department has 80,000 customers with an average of $200.00 per customer and collecting four times a year $64,000,000.00 is collected per year according to a quick calculation performed by the plaintiff.

61. How does the public benefit from 800 miles of pipe, when the water is being extracted from a main source in the outlining area of downtown Dayton i.e., a non-navigational water source that the plaintiff receives as a nonnavigational groundwater free-flowing water supply, which eventually could dry up, and enriching the water department and reducing the benefit of the plaintiff and property owner.

62. By 1899, the city system had grown to 118 miles of pipe; by 1934, 419 miles; and today the Dayton Water Department has approximately 800 miles of water main in service.

63. The city's water main system is now made up of ductile iron pipe, concrete pipe, and the old cast iron pipe. The size of the system's water mains has increased to as large as 48-inch diameter pipe.

64. Service Area: The Dayton Water Department service area over the years has expanded to include most of Montgomery County, including Dayton, Kettering, Vandalia, Riverside, Trotwood,

11

Brookville, parts of Greene County and extends north to serve Dayton International Airport, over 65 sq. miles! Water Department lines that carry an average of 75 MGD (million gallons / day.)

65. Clearly public interest is not the expectations of this municipality who governs the water department and overseen by the Major who serves as an elected public servant for Dayton.

66. At the time of the shut off, the plaintiff noticed the meter at the easement of the plaintiff's property, the meter was moving at an accelerated rate of speed.

67. Modern jurisprudence to decide whether a regulatory taking has occurred centers around the ad hoc factor-based test that the Supreme Court of the United States laid out in *Penn Central Transp. Co. v. New York City* (1973).

68. Courts are to consider the economic impact of governmental regulation, the extent to which the regulation interferes with investment-backed expectations, and the character of the governmental action. It is characterized as a disorganized test.

69. McNamara v. City of Rittman, 107 Ohio St. 3d 243 (2005), Dec. 21, 2005 · Supreme Court of Ohio · Nos. 2004-0357 and 2004-0363 107 Ohio St. 3d 243.

70. {¶ 19} The *Cline* standard assumes nonliability — a landowner is able to withdraw as much groundwater as he can put to beneficial use. *Cline* breaks from Frazier's absolute rule as soon as a common user is harmed.

71. Both *Frazier* and *Cline* recognize that aquifers are not neatly contained within property lines and that one landowner's use of water can have a detrimental effect on an adjoining landowner's groundwater supply. However, the *Frazier* court held that what happens below the surface of the land is so unknowable that we cannot determine with any certainty whether one person's use affects another person's use. *Cline* rejects that notion. In *Cline*, this court concluded that the 100 years of science since *Frazier* have enabled us

to reliably determine the effect of one landowner's water use on another landowner's property.

72. The court was persuaded by "[other American decisions [that] have recognized that the advancement of scientific knowledge can ensure the protection of a landowner's property rights in ground water to the same degree that the riparian doctrine protects the interests of landowners adjacent to a stream." Id., 15 Ohio St.3d at 386, 15 OBR 501, 474 N.E.2d 324. We note that the *Cline* court speaks of protecting a landowner's groundwater "property rights."

73. {¶ 20} *Cline* should thus be read as protecting landowners' property rights in groundwater, rather than limiting them. Through *Cline,* a property owner has a remedy against another property owner with land overlying a common aquifer, if the other landowner's use of the water unreasonably diminishes his water supply. Under *Cline,* a property owner's right to use the water underlying his property is not subject to a neighboring property owner's superior pumping system, as it would have been under *Frazier.*

74. Instead, a landowner's right to the water underlying his property is protected by law. A property owner has a potential cause of action against anyone who unreasonably interferes with his property rights in groundwater. That cause of action arises only from the effect on the landowner's water rights — no other effect on the overlying property is necessary for the cause of action to continue, such as homeowners low water pressure.

75. {¶ 26} In *Smith v. Erie RR. Co.* (1938), 134 Ohio St. 135, 11 O.O. 571, 16 N.E.2d 310, paragraph one of the syllabus, this court held:

76. {¶ 27} "Under Section 19, Article I, of the [Ohio] Constitution, which requires compensation to be made for private property taken for public use, any taking, whether it

be physical or merely deprives the owner of an intangible interest appurtenant to the premises, entitles the owner to compensation."

77. {¶ 34} Groundwater rights are knowable and protectible. This court in *Cline* established the nature of the right, and Ohio has statutorily defined what constitutes reasonable use. R.C. 1521.17. The well-being of Ohio homeowners, the stability of Ohio's economy, and the reliability of real estate transfers require the protection of groundwater rights. We therefore hold that Ohio landowners have a property interest in the groundwater underlying their land and that governmental interference with that right can be an unconstitutional taking.

78. Opinion concurring in judgment only; {¶ 35} I concur in the response of the majority to the extent that it holds that an Ohio landowner has a constitutionally protected property interest in groundwater that regularly occupies an aquifer underlying his land. The majority concludes that a property interest in groundwater originates from the reasonable-use component set forth in for Restatement of the Law 2d, Torts (1979), Section 858, specifically, subsection (l)(a).

## Remedy

## Complaint 1

The plaintiff should not have been assessed a debit of $375.79, nor any debit before the plaintiff gaining control of the property from July 10, 2021, until present date. The defendants need to apply any of those costs toward waste removal service, and fees not associated with water services.

The rest of the funds should be returned to the plaintiff three times the amount paid from July 10, 2021, until the date on which the case is resolved for not supplying the required notice for shut off.

A municipality billing a homeowner that services were never provided, and upon finding out that water was not traveling through pipelines of the municipality or Dayton Water Department. The only water flow measurement was from a meter owned by the Dayton Water Department, however, on the plaintiff's premises.

The Major a public elected official and the Dayton Water Department in this case have shown a total disregard for the plaintiff as not only a consumer, a United States citizen, and voting public resident of Dayton, Ohio and was treated as a second-class person with no say so.

**Complaint II**

The remedy for the second complaint is a bit more complicated, citing the possible diminishment of over the years that could jeopardize the plaintiffs' water flow. Just by the Dayton Water Department servicing the Dayton International Airport by using 75 million gallons (about 283905750 L) a day is astronomical.

The servicing of over 800 miles of pipe leading to what officials estimate as 80,000 customers (about the seating capacity of the Los Angeles Memorial Coliseum) per day seems like a small number. Mayor Jeffery J. Mimms, Jr, nor Mike Powell Director of The Department of Water Division of Water Utility cannot reasonably figure out how much the plaintiff has lost in benefits of economically reasonable use or value of his property.

The plaintiff is asking that the court grant the plaintiff injunction relief that will prevent the defendant's from sending billing statements which continue to increase although water is turned

off at the easement, or from placing any liens on the property at 24 Edgar Ave, Dayton, Ohio 45410 until a resolution of this federal court action.

The plaintiff asks that the court grant the plaintiff injunctive relief from diminishing, diverting or minimizing the plaintiff's water flow by digging deeper to servicing more customers in which they benefit and diminish the plaintiff's reasonable use of water, which has recently diminished.

History has shown that the Ohio Supreme court, Ohio Constitutional Law has upheld decisions on the rights of the plaintiff for reasonable use of water beneath his property.

The plaintiff is within his rights to protect and preserve any rights that the United States Constitutional Law allows landowner is effectively deprived of all economically reasonable use of water which flows beneath his property or reduced value of his property.

The Supreme Court of Ohio has ruled that a landowner has a property interest in any groundwater underlying the land and that governmental interference with that right could be considered unconstitutional.

Based on some of the above factors, and the fact that the plaintiff is experiencing a reduction in water flow could find himself without the benefit of protected waterflow. The plaintiff is asking $100.00 per 80,000 customers granted if correct, from July 2020 until the case is resolved.

The plaintiff is also asking the court to grant $60.00 per 80,000 customers on future payments at the three-month interval for the time in which the plaintiff owns the home, and due to diminished water pressure now that the defendant shall make water available to the plaintiff that those 80,000 customers that are receiving water.

The plaintiff in this case has provided exhibits supporting the complaint filed with the court, and information supported by the laws of Ohio, and the Ohio supreme could which allows the plaintiff to file this action under the constitution of the United States.

The plaintiff has shown the court that the plaintiff is protected under the Americans Disability Act as he is disabled and is protected under the Fifth Amendment and Fourteenth Amendment.

Respectfully,

11/15/2022

Peter Thompson (Pro se)

24 Edgar Ave

Dayton, Ohio 45410

(937) 972-3728

amthom1234@gmail.com

Defendant 1

Jeffery J. Mimms, Jr

Mayor of Dayton Ohio

City Hall 101 W 3rd Ave

Dayton, Ohio 45402 (937) 333-3653

Defendant 2

Mike Powell

Director at the Department of Water

City Hall 101 W 3rd Ave

Dayton, Ohio 45402 (937) 333-3734